## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| PREMIER INTERNATIONAL | ) | |
| HOLDINGS, INC., et al., | ) | |
| | ) | Case No. 09-12019(CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| ——————————————— | ) | |
| SIX FLAGS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Adv. Pro. No. 10-50061 (CSS) |
| | ) | |
| PARC MANAGEMENT, LLC, PARC | ) | |
| OPERATIONS, LLC, PARC | ) | Related Adv. Docket No. 19 |
| 7F-OPERATIONS CORPORATION, | ) | |
| PARC ELITCH GARDENS, LLC, | ) | |
| PARC WHITE WATER BAY, LLC, | ) | |
| PARC FRONTIER CITY, LLC, PARC | ) | |
| SPLASHTOWN, LLC, PARC | ) | |
| WATERWORLD, LLC, and PARC | ) | |
| ENCHANTED PARCS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION[1]

| | |
|---|---|
| BENESCH, FRIEDLANDER, | RICHARDS, LAYTON & FINGER, P.A. |
| COPLAN & ARONOFF LLP | Daniel J. DeFranceschi |
| Raymond H. Lemisch | Marcos A. Ramos |
| PNC Bank Center | Zachary I. Shapiro |
| 222 Delaware Avenue, Suite 801 | One Rodney Square |
| Wilmington, DE  19801 | 920 N. King Street |
| | Wilmington, DE  19801 |
| -and- | |
| | -and- |

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

David M. Wells                          Gregory A. Markel
GUNSTER, YOAKLEY                         Kathryn F. Shreeves
& STEWART, P.A.                          Cadwalader, Wickersham
One Enterprise Center                    & Taft LLP
225 Water Street, Suite 1750             One World Financial Center
Jacksonville, Florida 32202              New York, NY 10281

Counsel for Defendants                   Counsel for Six Flags, Inc.

Dated: November 19, 2010

Sontchi, J. _____

## INTRODUCTION

Before this Court is the defendants' motion to dismiss related to an action filed by Six Flags, Inc.  The adversary action asserts causes of action for (i) turnover pursuant to 11 U.S.C. § 542(b) (Count I); (ii) breach of contract (Counts II and III); and (iii) declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 (Count IV).  The Complaint seeks turnover of property of the estate, damages, and declaratory relief resulting from the defendant's alleged breach of an unsecured promissory note.  For the reasons set forth below, the Court grants the motion to dismiss Counts II and IV; and grants, *without* prejudice, the motion to dismiss Counts I and III.

## JURISDICTION

This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. § 1409.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Procedural History

In June 2009, Six Flags, Inc. ("Six Flags")[2] commenced its Chapter 11 cases by filing a voluntary petition in this Court.  Subsequently, Six Flags filed a complaint against the defendants, Parc Management, LLC, Parc Operations, LLC, Parc 7F-Operations Corp., Parc Elitch Gardens, LLC, Parc Frontier City, LLC, Parc Splashtown, LLC, Parc Waterworld, LLC, and Parc Enchanted Parks, LLC (collectively, "Parc").[3] The Complaint seeks turnover of property of the estate, damages, and declaratory relief resulting from Parc's alleged breach of the terms of an unsecured promissory note.[4] Parc filed a motion to dismiss all counts of the Complaint.  This matter is ripe for decision.

### II.    Factual History

####    A.    The Parties

Plaintiff, Six Flags, is a Delaware corporation with its principal place of business in New York, New York.  Six Flags owns and operates amusement parks throughout the United States.

Defendants, Parc Management, LLC and Parc 7F-Operations Corporation, are both incorporated and have principal places of business in Florida.  The remaining

---

[2]  Six Flags, Inc. changed its name to Six Flags Entertainment Corporation in accordance with the plan of reorganization confirmed by this Court on April 30, 2010.  Consequently, the plaintiff filed an Amended Complaint reflecting the name change.

[3]  Six Flags, Inc.'s Complaint for (I) Turnover of Estate Property; (II) Breach of Contract; (III) Declaratory Judgment; and (IV) Other Relief [D.I. 1] (hereinafter "Complaint").

[4]  *Id.* at 15.

Parc subsidiaries are similarly incorporated as Florida limited liability companies. Through its family of companies, Parc owns and operates amusement parks and family entertainment venues across North America.

B.  *The Amusement Park Acquisition Deal*

In April 2007, Parc acquired nine amusement parks from Six Flags for $312 million.  Parc paid $275 million of the purchase price in cash.  The remainder was financed by Six Flags through an unsecured subordinated promissory note (the "Note") with a face value of $37,000,000 that Parc agreed to pay, with interest, over approximately ten years.  Contemporaneously, Parc entered into a number of sale-leaseback transactions with a non-party, CNL Financial Group, Inc. ("CNL"), whereby CNL purchased the parks from Parc then leased them back to Parc.  Six Flags also assisted Parc in this financing arrangement by executing a Limited Rent Guaranty, guaranteeing Parc's lease obligations and/or deferring payments under the Note up to a maximum amount of $9,999,999.[5]

---

[5]  The Limited Rent Guaranty states, "Guarantor [Six Flags] hereby absolutely, unconditionally, and irrevocably guarantees to Landlord [CNL] the full, complete, and timely payment to Landlord of all rent up to a maximum amount  equal to the Guaranty Funding Limit. "  Defendants' Reply Brief (hereinafter "Defs.' Reply"), Ex. 1, § 2 [D.I. 54]. The Limited Rent Guaranty further defines the "Guaranty Funding Limit" as:

> [T]he lesser of (i) one dollar less than the aggregate net cash proceeds received by the Parc Guarantors as a result of an Equity Event, which amount shall be measured on the effective date of the closing of the transactions contemplated by the Securities Purchase Agreement and thereafter on the date a subsequent Equity Event occurs (but in no event more than two (2) times during the twelve month period following the Effective Date and each twelve month period thereafter) and (ii) Nine Million Nine Hundred Ninety-Nine and No/100 Dollars ($ 9,999,999) . . .

*Id.* at 3.

The dispute between the parties involves the first paragraph of the Note (the "Contested Provision"). This operative provision of the Note, outlining the payment schedule specifically states:

> Accrued and unpaid interest only shall be due and payable monthly on the outstanding principal balance at the applicable Interest Rate beginning on May 1, 2007, and continuing on the first (1st) day of each month thereafter until the Maturity Date. In addition, the principal shall be due and payable in consecutive annual payment of **ONE MILLION SEVEN HUNDRED THOUSAND AND NO/100TH DOLLARS (US $1,700,000.00)**, on the first day of January beginning on January 1, 2008 and continuing on each anniversary thereof through and including January 1, 2016, and the entire indebtedness evidenced hereby shall be due and payable in full, together with a balloon principal payment of **TWENTY ONE MILLION SEVEN HUNDRED THOUSAND AND NO/100TH DOLLARS (US $21,700,000.00)** on the Maturity Date; provided, however, that if the amount of the Limited Rent Guaranty (Six Flags) to be provided by the holder in favor of the Landlords (as defined therein) under the Leases as of the date of this Note is less than $9,999,999 (the excess of $9,999,999 over the amount of such guaranty, the **"Deferred Amount"**), then payments of principal and interest under this Note shall be deferred until such time as the total amount of deferred payments of principal and interest (such deferred payments, the **"Accrued Deferred Payments"**) equals the Deferred Amount, and the Deferred Amount shall be added to the balloon payment due hereunder; provided, further, however, that the Deferred Amount shall be reduced (but not below zero) by an amount equal to (i) $1,000,000 on January 1 of each year plus (ii) the amount of any Amount Funded[6] (as such term is defined in the Limited Rent Guaranty (Six Flags)); concurrently, therewith, the amount if any, by which the Accrued Deferred Payments exceeds the Deferred Amount, as adjusted, shall be paid in full to the

---

[6] The Limited Rent Guaranty defines "Amount Funded" as "all Guaranteed Rent paid during a Fiscal year by Guarantor." *Id.* at 2.

Holder.  If an Equity Event[7] (as such term is defined in the Limited Rent Guaranty (Six Flags)) occurs after the date of this Note, then the Deferred Amount shall be further reduced (but not below zero) by the amount of the net proceeds received by the Obligors upon consummation of such subsequent Equity Event effective as of the date of such Equity Event; concurrently, therewith, the amount if any, by which the Accrued Deferred Payments exceeds the Deferred Amount, as adjusted, shall be paid in full to the Holder. [8]

More simply, the Contested Provision provides that interest payments are due monthly, while principal payments are due annually, and the remainder of the principal will be paid in a balloon payment on the maturity date of the Note.  However, the Contested Provision provides for a deferral of principal and interest payments.  The Contested Provision states that Parc may defer payments of principal up to a maximum amount of approximately $10 million (the "Deferred Amount").  Per the calculation set forth in the Contested Provision, as of April, 2007, the Limited Rent Guarantee was $0.  Thus, as of the date the Note was entered, the Deferred Amount was $9,999,999.00.  Therefore, principal and interest payments were deferred until such amounts actually deferred (the "Accrued Deferred Payments") equaled the Deferred Amount ("Equalization").

Furthermore, the Deferred Amount was subject to three particular reductions: (1) $1 million each January 1st, (2) the value of any guaranteed rent paid by

---

[7]  The Limited Rent Guaranty defines "Equity Event" as "the occurrence of a receipt of cash proceeds by the Parc Guarantors from the issuance of equity." *Id.* at 3.

[8]  Compl., Ex. A, ¶ 1, pp. 1-2 (emphasis provided) [D.I. 1] (hereinafter, referred to solely as the "Note").

Six Flags under the Limited Rent Guaranty, and (3) the amount of net proceeds from an Equity Event.[9]

The Note designates that the laws of New York shall apply in the event of a dispute between the parties.[10]

*C.  The Subordination and Intercreditor Agreement*

The Note contemplated that Parc would enter into a working capital facility with another lender and, in the case of default under this working capital facility, payments under the Note would be subordinated to payments under the working capital facility.[11]  Section IV of the Note states:

> [Note Holder] agrees that the payment of all obligations owing to it pursuant hereto are and will be subordinated to the prior payment in full of any and all indebtedness and other obligations incurred by the Obligors under . . . the Working Capital Facility, provided that, such subordination of Holder in favor of the Working Capital Facility lender shall permit the payment of scheduled principal and interest payments under this Note so long as no default or event of default has occurred and is continuing under the Working Capital Facility.[12]

---

[9]  The definition of the "Guaranty Funding Limit" in the Limited Rent Guaranty provides parallel reductions. *See* Defs.' Reply, Ex. 1 at 5 [D.1. 64].

[10]  *See* Note, §V(C), at p. 8. ("This Note shall be governed by and construed in accordance with the laws of the State of New York").

[11]  Compl. at ¶ 14 [D.I. 1].

[12]  Note, §IV, at p. 7.

Section IV further provides that "nothing contained in [the] Note shall impair or otherwise affect the obligation of the Obligors to make regular monthly payments of interest and annual payments of principal as provided in the first paragraph."[13]

Parc entered into a working capital facility with SunTrust Bank ("SunTrust").  Accordingly, on April 15, 2008, Parc, Six Flags, and SunTrust entered into a subordination and intercreditor agreement (the "Subordination Agreement").  Under the Subordination Agreement, until Parc paid SunTrust in full, the only payments Parc could make to Six Flags were "Permitted Subordinated Debt Payments."[14]  The Subordination Agreement defines "Permitted Subordinated Debt Payments" as "regularly scheduled payments of interest on and principal of the Subordinated Debt due and payable on a non-accelerated basis in accordance with the terms of the Subordinated Debt Documents."[15]  Furthermore, the Subordination Agreement states that it shall not impair Parc's payment obligations to either Six Flags or SunTrust.[16] However, the Subordination Agreement further provides that if there is "any conflict between any term, covenant, or condition" in the Subordination Agreement and the Note, the provisions of the Subordination Agreement shall control and govern.[17]

---

[13]  *Id.*

[14]  *See* Defendants' Brief of Law in Support of Motion to Dismiss Six Flags, Inc.'s Complaint, Ex. 1, §2.3(a) [D.I. 19] (hereinafter "Defs.' Br.").

[15]  *Id.* at §1.

[16]  *Id.* at §10.

[17]  *Id.* at §11.

The Subordination Agreement designates that the laws of Florida shall apply in the event of a dispute between the parties.[18]

### D.  The Contract Dispute

As set forth above, upon the Note's inception, the Deferred Amount was $9,999,999.    The Deferred Amount was subsequently reduced by two events: (i) $1,000,000 on January 1, 2008, an annual reduction; and (ii) $4,999,999 by the occurrence of an Equity Event in January 2008.    Thus, in January 2008, the Deferred Amount was $4,000,000.[19]

At the same time, deferred principal and interest payments were accumulating.  Consequently, when the February 2008 interest payment was deferred, the scales tipped making the Accrued Deferred Payments exceed the Deferred Amount ($4,001,875 > $4,000,000).[20]  Thus, Equalization occurred, and the deferral of principal and interest payments terminated.[21]

Six Flags alleges that the Deferred Amount continues to be reduced thereby creating continual Excess Amounts until the Deferred Amount is $0.  Six Flags

---

[18]  *Id.* at §16 ("This Agreement shall be governed by and shall be construed and enforced in accordance with the internal laws of the State of Florida, without regard to conflicts of law principles").

[19]  Compl. at ¶ 22 [D.I. 1].

[20]  The amount by which the Accrued Deferred Amounts exceed the Deferred Amount is referred to herein as an "Excess Amount."

[21]  This is the characterization of the end of the deferral period taking the facts of the Complaint as true. *Id.* at ¶¶ 26, 28.  However, Parc alleges a different interpretation of the events surrounding February 1, 2008.  They claim that Equalization occurred on January 31, 2008 and that the interest due on that date was $228,333.33. *Id.*  Furthermore, they assert a correspondence between Six Flags and Parc regarding the future payments schedule took place, and "Six Flags accepted and agreed" Parc's calculations of principal and interest. *Id.*  Yet, no such correspondence or agreement was attached to the motion to dismiss.

alleges that pursuant to the terms of the Note, on January 1, 2009, the Deferred Amount was again reduced by $1,000,000.[22]   Cumulatively, the Accrued Deferred Payments exceeded the Deferred Amount by $1,001,875 (an "Excess Amount").   Thus, the plaintiff alleges this Excess Amount was due concurrently with the reduction on January 1, 2009.[23]   However, Parc did not pay this amount on January 1, 2009.

Therefore, Six Flags notified Parc that it was in default and demanded payment of the Excess Amount.[24]   The plaintiff alleges that despite the notice of default, Parc refused to pay the Excess Amount.[25]   However, Six Flags took no further action at that time.[26]

On January 1, 2010, pursuant to the terms of the Note, Six Flags asserts that the Deferred Amount was again reduced by $1,000,000, resulting in the Accrued

---

[22]   *Id.* at ¶ 29.

[23]   *Id.*

[24]   Despite only demanding $1,000,000, "Six Flags is entitled to seek recovery of the entire Excess Amount pursuant to the express terms of the Note" *Id.* at ¶ 32; Note at p. 2.

[25]   Parc argues that the Deferred Amount was added to balloon payment on February 1, 2008 and a payment of the Excess amount would be a prepayment. Compl. at ¶ 33 [D.I. 1].

[26]   This lapse in action leads one to question if negotiations took place between the first alleged breach and the filing of the Complaint, or if Six Flags acquiesced to Parc's refusal. *See Aliperti v. Laurel Links, Ltd.*, 810 N.Y.S.2d 921, 922 (N.Y. App. Div. 2006) (*citing Savitsky v. Sukenik*, 659 N.Y.S.2d 48, 49 (N.Y. App. Div. 1997) ("The refusal of one party to perform [the] contract amounts to an abandonment of it, leaving the other party to his [or her] choice of remedies, but his [or her] assent to the abandonment dissolves the contract so that he [or she] can neither sue for a breach nor compel specific performance."(citations omitted)).   However,

> '[a] party to an agreement who believes it has been breached may elect to continue to perform the agreement and give notice to the other side rather than terminate it.' When performance is continued and such timely notice is given, the nonbreaching party does not waive the right to sue for the alleged breach.

*Albany Med. Coll. v. Lobel*, 745 N.Y.S.2d 250, 252 (N.Y. App. Div. 2002) (*citing Capital Med. Sys. v. Fuji Med. Sys. U.S.A.*, 658 N.Y.S.2d 475, 478 (N.Y. App. Div. 1997).   The Complaint alleges that Six Flags notified Parc of the alleged breach on January 30, 2009.   Compl. at ¶ 31 [D.I. 1].

Deferred Payments exceeding the Deferred Amount by an additional $1,000,000 (now, the Excess Amount totaled $2,001,875 ($1,001,875 + $1,000,000)).  Thus, Six Flags alleges that Parc owes Six Flags a total of $2,001,875 as of January 1, 2010.[27]  Parc did not pay this amount and notified Six Flags that it will not pay any such future Excess Amounts.[28]

### E.  The Complaint

Shortly after Parc refused to pay the alleged Excess Amounts owed on January 1, 2010, Six Flags filed the Complaint with this Court.  In the Complaint, Six Flags claims that as a result of Parc's refusal to pay the $1,001,875 on January 1, 2009 and $1,000,000 on January 1, 2010, it is entitled to turnover of $2,001,875 plus statutory interest pursuant to 11 U.S.C. § 542(b).[29]  Six Flags also claims that it was damaged in the amount of $2,001,875 when Parc breached the terms of the Note by failing to pay the Excess Amounts.[30]  Moreover, Six Flags alleges that it has been damaged in an as yet undetermined amount when Parc further breached the terms of the Note by failing pay additional interest.[31]  Finally, Six Flags claims that it is entitled to a declaratory judgment for future breaches of the Contested Provision.[32]

---

[27]  Compl. at ¶¶ 43-47 [D.I. 1].

[28]  The Complaint also alleges upon the future reductions of the Deferred Amount, $1,000,000 would be owed each January 1st until 2012, when Deferred Amount would be reduced to $0 and no further reductions would take place. *Id.* at ¶ 34.

[29]  *Id.* at ¶¶ 37-41.

[30]  *Id.* at ¶¶ 43-47.

[31]  *Id.* at ¶¶ 49-51. Under the Note, the alleged failure to pay Excess Amounts would constitute an event of default, triggering an increased interest rate. *See* Note, §I(A)(1), I(B), at p. 3.

[32]  Compl. at ¶ 56 [D.I. 1].

F.  *The Motion to Dismiss*

Parc filed a motion to dismiss all counts of the Complaint.  The motion alleges that the complaint failed to state breach of contract claims because at Equalization the Deferred Amount is added to the balloon payment and is no longer subject to reduction, creating a "one-time" Excess Amount at Equalization.  Parc next argues that *even if* the Court were to agree with Six Flags' interpretation of the Contested Provision, the Excess Amounts were not permitted by the Subordination Agreement.[33]  Accordingly, the motion further argues that Six Flags' failed to state a claim (1) for turnover because the contractual dispute renders the claim premature and (2) for declaratory judgment because such a claim is duplicative of the breach of contract claims.[34]

## LEGAL DISCUSSION

**I.    The Standard Regarding Sufficiency of Pleadings When Evaluating a Motion to Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted.**

A motion under Rule 12(b)(6)[35] serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[36]  "Standards of pleading have been in the forefront of jurisprudence in recent years."[37]  With the Supreme Court's recent decisions

---

[33]  Defs.' Br., ¶ 3 [D.I. 19].

[34]  *Id.*

[35]  Federal Rules of Civil Procedure 8(a) and 12(b)(6) are made applicable to this adversary proceeding pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012, respectively.

[36]  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) ("The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." (citations omitted)).

[37]  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 209 (3d Cir. 2009).

in *Bell Atlantic Corp. v. Twombly*[38] and *Ashcroft v. Iqbal*,[39] "pleading standards have

seemingly shifted from simple notice pleading to a more heightened form of pleading,

requiring a plaintiff to plead more than the possibility of relief to survive a motion to

dismiss."[40]

      In *Iqbal*, the Supreme Court makes clear that the *Twombly* "facial

plausibility" pleading requirement applies to all civil suits in the federal courts.[41]

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements" are insufficient to survive a motion to dismiss.[42]  Rather, "all civil

complaints must now set out sufficient factual matter to show that the claim is facially

plausible."[43]  A claim is facially plausible "when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

---

[38]  550 U.S. 544 (2007).

[39]  129 S. Ct. 1937 (2009).

[40]  *Fowler*, 578 F.3d at 210.

[41]  *See Fowler*, 578 F.3d at 210.

[42]  *Iqbal*, 129 S. Ct. at 1949.  *See also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (citations omitted); *Bartow v. Cambridge Springs SCI*, 285 Fed. Appx. 862, 863 (3d Cir. 2008) ("While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions.); *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001) ("Liberal construction has its limits, for the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists on which relief could be accorded the pleader. Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.  While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions." (citations omitted)).

[43]  *Fowler*, 578 F.3d at 210 (internal quotations omitted).  *See also Iqbal*, 129 S. Ct. 1950 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Buckley v. Merrill Lynch & Co. (In re DVI, Inc.)*, 2008 Bankr. LEXIS 2338 (Bankr. D. Del. Sept. 16, 2008) ("Rule 8(a) requires a showing rather than a blanket assertion of an entitlement to relief.  We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only fair notice, but also the grounds on which the claim rests."(citations omitted)).

misconduct alleged."[44]  Determining whether a complaint is "facially plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.[45]  But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but not shown - that the pleader is entitled to relief."[46]

After *Iqbal*, the Third Circuit has instructed this Court to "conduct a two-part analysis.  First the factual and legal elements of a claim should be separated.  The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[47]  The court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief."[48]

---

[44] *Iqbal*, 129 S. Ct. at 1949.

[45] *Iqbol*, 129 S. Ct. at 1950.  "It is the conclusory nature of [plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.* at 1951.

[46] *Id.* at 1950 (citations and internal quotations omitted).

[47] *Fowler*, 578 F.3d at 210-11.  *See also Twombly*, 550 U.S. at 555 (holding that a court *must* take the complaint's allegations as true, no matter how incredulous the court may be); *Iqbal*, 129 S. Ct. at 1949-50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . When there are well-plead factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007); *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004).  The Court may also consider documents attached as exhibits to the Complaint and any documents incorporated into the Complaint by reference.  *In re Fruehauf Trail Corp.*, 250 B.R. 168, 183 (Bankr. D. Del. 2000) (*citing PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993)).  "[I]f the allegations of [the] complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint."  *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005).  *See also Sunquest Info. Sys., Inc. v. Dean Whitter Reynolds, Inc.*, 40 F. Supp. 2d 644, 649 (W.D.Pa. 1999) ("In the event of a factual discrepancy between the pleadings and the attached exhibit, the exhibit controls." (citations omitted)).

[48] *Fowler*, 578 F.3d at 211 (internal quotations omitted) ("[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." (citations omitted)).  "The plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim."  *Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.)*, 2008 Bankr. LEXIS 2338, at *13 (Bankr. D. Del. Sept. 16, 2008).

The Third Circuit has further instructed that "[s]ome claims will demand relatively more factual detail to satisfy this standard, while others require less."[49]

## II.    The Plausibility of Plaintiff's Claims for Relief.

### A.    Counts II and III: Breach of Contract Claims Against Parc.

The threshold disputes presented before the Court are (i) the timing of payment of an Excess Amount, if any; and (ii) whether it is plausible that the Deferred Amount (the amount actually deferred by Parc, $4 million) continued to be reduced creating additional Excess Amounts due; as opposed to adding the Deferred Amount, at Equalization, to the balloon payment subject to no further reductions.

Counts II and III of the Complaint are breach of contract claims. [c1]Count II seeks damages of $2,001,875 for Parc's alleged failure to pay Excess Amounts due under the Contested Provision of the Note.  Count III seeks damages claiming that the failure to pay the Excess Amounts was a termination event under the Note which triggers additional interest (4%) which was allegedly owed since January 30, 2009.

Parc's motion to dismiss argues that the terms of the Note do not warrant payment of the Excess Amounts allegedly owed in the Complaint.  Claiming that the Note is unambiguous, Parc interprets the Contested Provision as stating that, upon Equalization, the Deferred Amount is added to the balloon payment, and no further reductions to the Deferred Amount occur.  They contend that a balloon payment, by

---

[49] *In re Ins. Brokerage Antitrust Litig.*, 2010 U.S. App. LEXIS 17107, 46-47 n. 18 (3d Cir. Aug. 16, 2010).  *See also Arista Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010) (stating that *Twombly* and *Iqbal* require factual amplification where needed to render a claim plausible, not pleadings of specific evidence or extra facts beyond what is needed to make a claims plausible).

definition, is made at maturity and cannot be prepaid.  Furthermore, Parc argues that even if the Note allows further reductions to the Deferred Amount, the Excess Amount payments would be prohibited payments under the terms of the Subordination Agreement.

In response, Six Flags claims that the unambiguous language of the Note provides that the Deferred Amount is subject to reductions after Equalization, therefore, entitling Six Flags to the Excess Amount payments it seeks.  Six Flags also contests that the Subordination Agreement has no bearing on the alleged Excess Amount payments owed by Parc.

Parc replied that a plain reading of the Note as a whole is incongruous with Six Flag's interpretation of the Note, arguing that Six Flag's interpretation would erroneously lead to the absurd result of Parc owing far more in Excess Amounts than the amount of Accrued Deferred Payments, $4,001,875.  Parc also reiterates that the terms of the Subordination Agreement prohibit the Excess Amount payments.

For simplicity's sake the reduction to the Deferred Amount as accrual of the Accrued Deferred Payments works as follows:

| Date | Principal and interest *actually* deferred ("Accrued Deferred Amount") | Maximum deferred amount ("Deferred Amount") | Event | Explanation |
|---|---|---|---|---|
| April 6, 2007 | N/A | $10 million | | Parc's annual principal payment and interest thereon is deferred |
| January 1, 2008 | $2 million | $9 million | $1 million annual reduction | |
| January 1, 2009 | $4 million | $8 million | $1 million annual reduction | |
| January 1, 2010 | $6 million | $7 million | $1 million annual reduction | |
| January 1, 2011 | $8 million | $6 million | $1 million annual reduction | Equalization occurs; including accrual of an "Excess Amount"; Parc begins monthly interest payments |
| January 1, 2012 | Parc begins paying annual principal, in addition to its continued obligation to make monthly interest payments | | | |

Parc argues that (in this example) the following occurs: (i) $6 million (the Deferred Amount) is added to the balloon payment, (ii) Parc pays the $2 million Excess Amount ($8 million - $6 million), and (iii) Parc pays principal and interest when due per the Note.  In Parc's argument the chart would be as follows, again using the simplistic explanation:

*[remainder of page intentionally left blank]*

| Date | Principal and interest *actually* deferred ("Accrued Deferred Amount") | Maximum deferred amount ("Deferred Amount") | Event | Explanation |
|------|------|------|------|------|
| April 6, 2007 | N/A | $10 million | | Parc's annual principal payment and interest thereon is deferred |
| January 1, 2008 | $2 million | $9 million | $1 million annual reduction | |
| January 1, 2009 | $4 million | $8 million | $1 million annual reduction | |
| January 1, 2010 | $6 million | $7 million | $1 million annual reduction | |
| January 1, 2010 | $8 million | $6 million | $1 million annual reduction | Equalization occurs; including accrual of an "Excess Amount"; Parc beings making it interest obligation payments per the terms of the Note |
| | $6 million would be added to the balloon payment; Parc would pay the "Excess Amount ($8 million - $6 million = $2 million) and Parc would begin making payments of principal; and continue its monthly interest obligations per the terms of the Note | | | |

Six Flags claims that the Deferred Amount continues to reduce annually (or upon the other two reduction scenarios) and concurrent with each reduction-event, Parc would pay the (in this scenario) $1 million annual reduction until the Deferred Amount was paid-in-full. In Six Flags' argument the chart would be as follows, again using the simplistic explanation:

*[remainder of page intentionally left blank]*

| Date | Principal and interest *actually* deferred ("Accrued Deferred Amount") | Maximum deferred amount ("Deferred Amount") | Event | Explanation |
|---|---|---|---|---|
| April 6, 2007 | N/A | $10 million | | Parc's annual principal payment and interest thereon is deferred |
| January 1, 2008 | $2 million | $9 million | $1 million annual reduction | |
| January 1, 2009 | $4 million | $8 million | $1 million annual reduction | |
| January 1, 2010 | $6 million | $7 million | $1 million annual reduction | |
| January 1, 2010 | $8 million | $6 million | $1 million annual reduction | Equalization occurs; including accrual of an "Excess Amount"  Parc begins to pay principal and interest per the terms of the Note, as well as, the Excess Payment ($8 million - $6 million = $2 million) |
| January 1, 2011 | $6 million | $5 million | $1 million annual reduction | In addition to principal and interest per the terms of the Note, Parc would pay an additional Excess Amount of $1 million |
| January 1, 2012 | $5 million | $4 million | $1 million annual reduction | In addition to principal and interest per the terms of the Note, Parc would pay an additional Excess Amount of $1 million |
| January 1, 2013 | $4 million | $3 million | $1 million annual reduction | In addition to principal and interest per the terms of the Note, Parc would pay an additional Excess Amount of $1 million |
| January 1, 2014 | $3 million | $2 million | $1 million annual reduction | In addition to principal and interest per the terms of the Note, Parc would pay an additional Excess Amount of $1 million |
| January 1, 2015 | $2 million | $1 million | $1 million annual reduction | In addition to principal and interest per the terms of the Note, Parc would pay an additional Excess Amount of $1 million |
| January 1, 2016 | $1 million | $0 | $1 million annual reduction | In addition to principal and interest per the terms of the Note, Parc would pay an additional Excess Amount of $1 million |

i.    *New York Law Regarding Contract Interpretation*

Under New York Law,[50] a breach of contract claim must allege: "(1) formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages."[51]    A breach of contract claim must allege specific facts regarding the date of the formation of the contract, the parties to the contract, and the contract's "major terms."[52]    In addition, the pleading must "contain allegations about the specific provisions upon which liability is predicated."[53]    To survive a motion to dismiss, however, a plaintiff does not have to plead a "concrete amount of damages,"[54] but facts upon which damages caused by the defendant can be inferred.[55]

The Complaint establishes three of the breach of contract elements for Counts II and III.    Existence of the agreement is provided with the attachment of the Note in an exhibit, Six Flags performed their obligation under the agreement by executing the Note and supplying seller financing to Parc, and both breach of contract

---

[50]  *See* note 10, *supra.*

[51]  *Berman v. Sugo, LLC*, 580 F.Supp.2d 191, 202 (S.D.N.Y. 2008).  *Am. Home Mortg. Inv. Corp. v. Lehman Bros. (In re Am. Home Mortg.  Holdings, Inc.)*, 388 B.R. 69, 93 (Bankr. D. Del. 2008).

[52]  *Id.*

[53]  *Rodriguez v. It's Just Lunch, Int'l*, 2010  U.S. Dist. WL 685009, at *10 (S.D.N.Y. Feb. 23, 2010)  (*citing Sud v. Sud*, 621 N.Y.S.2d 37, 38 (N.Y. App. Div. 1995)).  *See also Krouner v. Koplovitz*, 572 N.Y.S.2d 959, 962 (N.Y. App. Div. 1991) (holding the complaint failed to state a breach of contract action because "[t]he terms of the agreement [were] not set out, nor [did] the complaint allege that the defendants promised plaintiff to achieve a specific result).

[54]  *In re Food Mgmt. Group, LLC*, 380 B.R. 677, 700 (Bankr. S.D.N.Y. 2008).

[55]  *Weber v. Align Tech.*, 2010 U.S. Dist. WL 2265418 (N.D.N.Y. June 2, 2010) (*citing In re Grumman Olson Indus.*, 329 B.R. 411, 423 (Bankr. S.D.N.Y. 2005)) (finding plaintiff's pleading sufficient to survive a motion to dismiss because the allegations put defendant on fair notice of the alleged damages and claimed that the damages were caused by the breach of contract).

claims state sufficient allegations of damages caused by Parc.  The only element in dispute is the alleged breach of the Note by Parc.  Because the event of the default in Count III exists only if the terms of the Note were breached under Count II, Count II is determinative of Count III.

>    ii.    *Does Parc owe Excess Amounts Continually under the Contested Provision?*

To determine the plausibility of Parc's breach, the Court must construe the meaning of the Contested Provision and whether, in light of both parties' interpretations, the terms of the Note are ambiguous.  "It is not necessarily true that a court considering a Rule 12(b)(6) motion in the context of a contract dispute must accept as true the construction of a contract proffered by the plaintiff."[56]  The determination of the existence of ambiguity in a contract and the interpretation of a clear and unambiguous contract are both appropriate questions of law for a court to decide when adjudicating a motion to dismiss.[57]  Agreements must be interpreted "in accord with the parties' intent."[58]  Extrinsic evidence of intent may only be considered if an agreement is

---

[56] *Falkenberg Capital Corp. v. Dakota Cellular, Inc.*, 925 F.Supp. 231, 236 (D. Del. 1996).

[57] *Id.* ("It is for the Court to determine whether a contract term is ambiguous or unambiguous, as this determination is a question of law."); *Kass v. Kass*, 696 N.E. 2d 174, 180 (N.Y. 1998) ("Whether an agreement is ambiguous is a question of law for the courts . . . Ambiguity is determined by looking within the four corners of the document"); *In re Am. Home Mortg. Holdings, Inc.*, 388 B.R. at 90-91 ("As the relevant terms of the [contract] are clear and unambiguous, their meaning is an issue of law, which the Court may consider in the context of a motion to dismiss."); *Sunrise Mall Assoc. v. Import Alley of Sunrise Mall, Inc.*, 621 N.Y.S.2d 662, 663 (N.Y. App. Div. 1995) ("Interpretation of an unambiguous contract is a matter for the court").

[58] *Greenfield v. Philles Records, Inc.*, 780 N.E. 2d 166, 170 (N.Y. 2002).

ambiguous, where two reasonable interpretations of contractual provisions exist.[59]

However, language that has a plain meaning "'does not become ambiguous merely

because the parties urge different interpretations in the litigation.'"[60]

"When parties set down their agreement in a clear, complete, document,

their writing . . . should be enforced according to its terms . . . . [I]n the context of real

property transactions, where commercial certainty is a paramount concern and where . .

. the instrument was negotiated between sophisticated, counseled business people

negotiating at arm's length" this principle of contractual interpretation is particularly

important.[61]   Grammatical construction is a "reliable signpost" to discover the parties'

---

[59]  *Id.* ("A contract is unambiguous if the language it uses has a 'definite and precise meaning'. . . if the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity."); *Maxim Group, LLC v. Life Partners Holdings, Inc.*, 690 F.Supp.2d 293, 304 (S.D.N.Y. 2010) ("[A] contractual provision is not rendered ambiguous simply because two interpretations are technically possible; both interpretations must also be reasonable"); *See e.g. Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 116 (2d Cir. 1994) (finding a contract ambiguous given two reasonable interpretations).

[60]  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009) (*quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989).  *See Riverside South Planning Corp. v. CRP/Extell Riverside, L.P.*, 869 N.Y.S. 2d 511, 517 (N.Y. App. Div. 2008).

[61]  *South Road Assocs. v. Intern. Business Machines Corp.*, 826 N.E.2d 806, 809 (N.Y. 2005) (*citing Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d  876, 879 (N.Y. 2004) .  *See Quantum Chemicals Corp. v. Reliance Group, Inc.*, 580 N.Y.S.2d 275, 276 (N.Y. App. Div. 1992) ("There is a presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties; such a presumption should apply with even greater force when the instrument is between sophisticated, counseled businessmen."); *John Doris, Inc. v. Solomon R. Guggenheim Found.*, 618 N.Y.S.2d 99, 100 (N.Y. App. Div. 1994) ("[C]ourts may not rewrite the agreement to relieve a sophisticated contracting party from terms that it later deems disadvantageous.").  *See also Greenfield*, 780 N.E. 2d at 170 ("'The best evidence of what parties to a written agreement intend is what they say in their writing.'" (citations omitted)).

intent.[62]  The New York Supreme Court has adopted the "last antecedent doctrine" and

has applied it to contract interpretation.[63]  The last antecedent doctrine states:

> Relative or qualifying words or clauses in a statute are to be
> applied to words or phrases immediately preceding, and are
> not to be construed as extending to others more remote,
> unless the intent clearly indicates otherwise.[64]

Nevertheless, a contract should be read as a whole, so that "[f]orm [does] not prevail

over substance and [the] sensible meaning of words."[65]

> The rules of construction of contracts require us to adopt an
> interpretation which gives meaning to *every* provision of a
> contract or, in the negative, no provision of a contract should
> be left without force and effect. Even if there was an
> inconsistency between a specific provision and a general
> provision of a contract . . ., the, [sic] specific provision
> controls.[66]

---

[62]  *Amusement Consultants v. Hartford Life Insurance Co.*, 625 N.Y.S. 2d 901, 902 (N.Y. App. Div. 1995) (*quoting Wirth & Hamid Fair Booking v. Wirth*, 192 N.E. 297 (N.Y. 1934)).

[63]  *Duane Reade, Inc. v. Cardtronics*, 863 N.Y.S.2d 14, 17 (N.Y. App. Div. 2008) (stating that applied to a contract, the last antecedent doctrine "becomes essentially an application of English language grammar, with an eye to the four corners of the contract.").

[64]  *Id.*

[65]  *Kass*, 696 N.E.2d at 180-81 (*citing Atwater & Co. v. Panama R.R. Co.*, 159 N.E. 418 (N.Y. 1927)). *See Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670 (N.Y. 2003) (stating that a contract will be read as whole because if "undue force" is placed on certain parts, the "general purpose" or meaning may be distorted); *USA Network v. Jones Intercable, Inc.*, 729 F.Supp. 304, 308 (S.D.N.Y. 1990) (declining to interpret a contract in a way that would reach an absurd result clearly contrary to the plain and unambiguous language").

[66]  *DBT GmbH v. J.L. Mining Co.*, 544 F. Supp. 2d 364, 377-378 (S.D.N.Y. 2008) (citations omitted; emphasis added). *See D.C. USA Operating Co. v. Indian Harbor Ins. Co.*, Case No. 07-CV-0116, 2007 U.S. Dist. LEXIS 25133, 25-26 (S.D.N.Y. Mar. 23, 2007) (defendants' interpretation of the [contract] would essentially write out the word "known" from the exclusion entirely. There is no need to qualify "petroleum hydrocarbons" or "pollution conditions" with the terms "known" or "known to the insured," if the upshot of the exclusion is that all petroleum hydrocarbons found during excavation and all pollutants described in the 2005 GeoConcepts Report, are not covered by the policy. "Known" serves no purpose under the defendants' proposed interpretation and that interpretation is therefore disfavored."); *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (N.Y. 1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect." (citations omitted)); *see also Saffire Corp. v. Newkidco, LLC*, 286 F. Supp. 2d 302, 308 (S.D.N.Y. 2003) (granting summary judgment and noting that "if Newkidco

A court's goal should a "practical interpretation of the expressions of the parties to the end that there [is] a 'realization of [their] reasonable expectations.'"[67] Thus, a court may consider a contract's reasonable implications in addition to its literal language.[68]

The language of the Contested Provision, notwithstanding the two interpretations proffered by the parties, is clear and unambiguous. Furthermore, both Six Flags and Parc are sophisticated business entities, who, at arm's length, executed a real property transaction.

### a. Timing and Payment of Excess Amount(s)

The Note speaks to the timing for the payments of the Excess Amount:

> concurrently, therewith, the amount, if any, by which the Accrued Deferred Payments exceeds the Deferred Amount, as adjusted, shall be paid in the full to the [Six Flags].

This language appears in two places in the Contested Provision, immediately following descriptions of reductions to the Deferred Amount.[69] This phrase speaks directly to the

---

could avoid the obligations agreed to under the early termination provision by simply discontinuing payments, this would defeat the purpose of the provision and render it meaningless"); *Two Guys from Harrison-N.Y. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 403 (N.Y. 1984) ("In construing a contract, one of a court's goals is to avoid an interpretation that would leave contractual clauses meaningless." (citations omitted)). *See also ABN AMRO Verzekeringen BV v. Geologistics Ams., Inc.*, 485 F.3d 85, 102 (2d Cir. N.Y. 2007); *Rosewood Apts. Corp. v. Perpignano*, Case No. 99 Civ. 4226, 2001 U.S. Dist. LEXIS 7777, at *9-10 (S.D.N.Y. June 11, 2001); *United States Fire Ins. Co. v. Altech Yachts, Inc.*, Case No. 90 Civ. 8143, 1991 U.S. Dist. LEXIS 15793, at *18 (S.D.N.Y. Oct. 30, 1991).

[67] *Duane Reade, Inc.*, 863 N.Y.S.2d at 16 (*quoting Brown Bros. Elec. Constr. v. Beam Constr. Corp.*, 361 N.E.2d 999 (N.Y. 1977)).

[68] *Id.* (*quoting Sutton v. East River Sav. Bank*, 435 N.E.2d 1075 (N.Y. 1982)). *But see Vermont Teddy Co.*, 807 N.E.2d at 879 (" '[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.' "(*quoting Rowe v. Great Atl. & Pac. Tea Co.*, 835 N.E.2d 566 (N.Y. 1978)).

[69] Note at ¶ 1, pp 1-2 [D.I. 1]. Upon Equalization, the Deferred Amount is reduced by (i) $1 million each January 1st, (ii) the value of any guaranteed rend paid by Six Flags under the Limited Rent Guaranty, and (iii) the amount of net proceeds from an Equity Event.

timing of the payments to Six Flags.  "Concurrently" is defined as "operating at the same time . . . ."[70]  The plain and unambiguous language of the Note indicates that upon Equalization, if the Accrued Deferred Payments exceeded the Deferred Payments (i.e. the Excess Amount),[71] the Excess Amount would be due concurrently with the Equalization event.

Therefore, it is plausible that Parc must pay any Excess Amount at the same time as Equalization.  But, is it plausible that the Deferred Amount continues to reduce after Equalization, thereby creating continuous Excess Amounts until the Deferred Amount is paid in full?

### b. Is the Deferred Amount Reduced After Equalization?

Parc argues that once Equalization has occurred the Deferred Amount is added to the balloon payment and no further reductions to the Deferred Amount take place.  Parc focuses on the following language, that upon Equalization:

> the Deferred Amount shall be added to the balloon payment
> due hereunder.

This phrase supersedes the Deferred Amount reduction/payment language.  Six Flags argues that the entire "provided, further however" clause applies to the whole preceding clause which describes Equalization and the clause "the Deferred Amount

---

[70] *Black's Law Dictionary* (8th ed. 2004).

[71] This calculation is algebraic:  If Accrued Deferred Amount > Deferred Amount; then Accrued Deferred Amount – Deferred Amount = Excess Amount.

shall be added to the balloon payment . . . ." Arguing that the reduction language *also* attaches to the last phrase, thereby continually reducing the Deferred Amount.

Parc responds that adapting Six Flags' construction of the Contested Provision would lead to an absurd result. The Court agrees. If the Deferred Amount is not added to the balloon payment upon Equalization, it would write-out the contractual phrase "and the Deferred Amount shall be added to the balloon payment due hereunder."[72]

Moreover, if the Deferred Amount is added to the balloon payment and then reduced (or pre-paid) then it would controvert the definition of a balloon payment.[73] Although Six Flags has pled sufficient facts taken as true to support its claims, the Note contradicts the allegations and controls.[74]

It simply does not make sense[75] that with this complicated system of deferral the deferral was only temporary as it is continually reduced even after Equalization. The Court is further convinced by what the Note does *not* say. For example, assuming *arguendo* that Six Flags' interpretation is correct, the Note is silent as to the treatment of the Deferred Amount ($4 million) while it is being reduced. The Note does not state that the $4 million is added to the balloon payment, including

---

[72] *See* note 66, *supra.*

[73] "Balloon payment" is defined as "[a] **final** payment that is usually mush larger than the preceding regular payments and that discharges the principal balance of the loan. *Black's Law Dictionary* (8th ed. 2004) (emphasis added). Furthermore, a "balloon note" is defined as "[a] note requiring small periodic payments but a very large **final** payment." *Id.* (emphasis added).

[74] *See Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005).

[75] *Iqbol* promotes the use of judicial experience and common sense. *Iqbol*, 129 S. Ct. 1950.

accrual of interest (if any), but the principal ($4 million) is then pre-paid;[76] the Note does not state that the $4 million becomes a different fund, including but not limited to how interest (if any) accrues on this "new fund."   The Court finds that Six Flags interpretation of the Contested Provision is not logical when looking at the Contested Provision *in toto*.[77]   The Court finds that the only plausible interpretation of the Contested Provision is that at Equalization, the Deferred Amount, $4 million, is added to the balloon payment and is not subject to further reductions.

       *iii.*    *Conclusion*

As the Court holds that Six Flags' position that the Deferred Amount decreases even after Equalization is not plausible.   However, the Court finds that it is plausible that at Equalization the Excess Amount, alleged to be $1,875, should have been paid concurrently with Equalization.   The Court believes that in the scope of this Note, $1,875 is a *de minimis* amount[78] and, as such, does not implicate the Subordination Agreement; therefore the Court will not address whether the Subordination Agreement would prohibit this payment ($1,875).[79]   Thus, the Court grants the motion to dismiss Count II of the Complaint.

---

[76]  At Equalization, $4 million would be added to the balloon payment; but Six Flags claims that Parc would pay-back annually part of the balloon payment that was reflective of the Deferred Amount.  In the Court's view this is akin to a penalty.

[77]  *Duane Reade, Inc.*, 863 N.Y.S.2d at 18-19. "[I]t has long been the rule, in construing contracts, that "particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." *Id.* at 19 (*citations and internal quotations omitted*).

[78]  The Court notes that the remaining amount alleged owed is .04% of the amount at issue.

[79]  Out of an abundance of caution, the Court reserves the parties' rights to argue that such payment would controvert the Subordination Agreement.

B. *Count III: The Second Claim for Breach of Contract against Parc*

Count III alleges that Parc's alleged failure to pay the Excess Amounts upon Equalization would constitute an "Event of Default" under the terms of the Note, triggering an interest rate increase.[80]  Taking into account the Court's ruling above, Six Flags' remaining contention related to the Excess Amount is $1,875.  Viewing the allegations in the Complaint as true, this Excess Amount has not been paid by Parc.  However, as such amount is *de minimis*, the Court grants the motion to dismiss regarding Count III, *without* prejudice.  Six Flags' rights to plead payment of $1,875 and whether it would constitute an "Event of Default" triggering the interest rate increase are hereby reserved.

C. *Count I: The Claim for Turnover of Property to the Estate Against Parc*

Count I of the Complaint alleges that Parc owed Six Flags Excess Amounts on January 1, 2009, and January 1, 2010, under the terms of the Note, and that these Excess Amounts are matured and due and payable, therefore, subject to turnover.  It further alleges that because Parc failed to pay the Excess Amounts, Six Flags is entitled to turnover of $2,001,875.

As discussed above, the only plausible Excess Payment that Six Flags alleges Parc did not pay is $1,875.  As noted above, it is plausible that this alleged debt is matured and may be subject to turnover.  However, as this alleged amount is *de*

---

[80]  Under the Note, the alleged failure to pay Excess Amounts would constitute an event of default, triggering an increased interest rate.  *See* Note, §I(A)(1), I(B).

*minimis*, the motion to dismiss is granted, *without* prejudice.  Six Flags' rights to plead turnover related to the alleged Excess Amount of $1,875 is hereby reserved.

### D.  Count IV: The Claim for Declaratory Judgment against Parc

As the Court has found that Six Flags' interpretation of the Contested Provision is not plausible, the Court finds that Six Flags' averments of declaratory judgment are moot.  As such, the Court grants the motion to dismiss Count IV of the Complaint.

## CONCLUSION

For the foregoing reasons, the Court grants, *without* prejudice, the motion to dismiss Count I of the Complaint for turnover of the property of the estate; grants, as set forth herein, the motion to dismiss Count II; grants, *without* prejudice, the motion to dismiss Count III of the Complaint for breach of contract; and grants the motion to dismiss Count IV of the Complaint for declaratory judgment.

An order will be issued.